*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
June 10, 2021

Plaintiff-Appellee,

v

No. 351362
Kalamazoo Circuit Court
LC No. 2019-000689-FH

ANTHONY TONY-CARIOUS HARRIS, JR.,

Defendant-Appellant.

Before: REDFORD, P.J., and BORRELLO and TUKEL, JJ.

PER CURIAM.

Defendant was convicted following a bench trial of one count of assault with a dangerous weapon (felonious assault), MCL 750.82; one count of felon in possession of a firearm (felon-in-possession), MCL 750.224f; and two counts of possessing a firearm during the commission of a felony (felony-firearm), MCL 750.227b(1).[1] The trial court sentenced defendant as a third-offense habitual offender, MCL 769.11, to 3 to 8 years' imprisonment for the felonious-assault conviction, 3 to 10 years' imprisonment for the felon-in-possession conviction, and 2 years' imprisonment for each of the felony-firearm convictions, with the felony-firearm sentences to be concurrent to each other and served consecutively to and preceding the sentences for felonious assault and felon-in-possession, which in turn were concurrent to each other. Defendant now appeals as of right. For the reasons set forth in this opinion, we affirm defendant's convictions and sentences but remand for the ministerial task of correcting defendant's score for offense variable (OV) 4.

## I. BACKGROUND

This case arises out of events that occurred during the early morning hours of May 4, 2019. On the night of May 3, 2019, Precious Sanders went out for the evening with a group of people that included her friend, Jennifer Spicer. The group also included Jimmy Spicer, who was

---

[1] Defendant was also acquitted of one count each of felonious assault; felony-firearm; and assault, MCL 750.81.

-1-

Jennifer's brother, Mariah,[2] who was Jennifer's friend, and defendant, who was Jennifer's boyfriend. Sanders testified, "At first it was goin' smooth and then by the end of the night it was horrible." The trouble apparently began at about 3:00 a.m. on May 4.

Sanders testified that they all were in the car after being "out drinkin' and smokin'." According to Sanders, defendant "was disrespectin' me and Jennifer and the other girl, Mariah, all that night, and I asked Jennifer to simply check her boyfriend, like you know he's being disrespectful, you need to check him and she didn't say anything, she allowed it to continue." Sanders and defendant "exchanged words." Both of them were angry. They dropped Mariah off, and Sanders asked to be taken home. Sanders testified that the argument continued during the approximately 5-minute drive to her house. Sanders lived in Kalamazoo with Evan Jones, EJ, who was the 11-year-old son of Sanders and Evan, and Evan's parents.

Sanders testified that once they arrived at her house, further insults were exchanged between her and defendant, at which time defendant "jumped" on her. According to Sanders, defendant pulled off her wig and was punching her in the head. She ran to the front of the car and was trying to defend herself while defendant was on top of her. They were apparently at least partially outside the car at this point, and they were hitting each other. EJ came out of the house and tried to get defendant off Sanders. Sanders told EJ to stop and to get his dad. Sanders "was yellin' it while he was still hitting me and everything was going crazy." The fighting stopped, Sanders and Jennifer began arguing, and Evan came out of the house. Evan testified that when he came outside, he saw defendant, Jimmy, Jennifer, Sanders, and "some other people" arguing. Sanders testified that defendant denied having assaulted her when he was questioned by Evan and that "[a]ll of 'em told him I was drunk." Defendant, Jimmy, and Jennifer left.

After going inside the house, Sanders and Evan left again to get cigarettes for Evan's mother. Sanders was carrying a hammer "for protection." Jimmy, Jennifer, and defendant returned. Sanders estimated that approximately 10 to 15 minutes had elapsed. Sanders walked over to the vehicle and asked for her belongings that she had left in the vehicle. Jimmy was driving, and Sanders approached the driver's side of the vehicle. Jennifer was sitting in the front passenger seat, and defendant was sitting in the back seat on the passenger side. Evan was walking behind Sanders. Sanders and Evan both testified that Evan did not have a weapon. Sanders further testified that she did not raise her hammer or threaten anyone with it and that she "was screamin' where's my shit[?]" Sanders saw defendant point a gun at her. Defendant was getting out of the vehicle. Evan testified that he saw defendant with a "pistol" in his hand once defendant was outside the vehicle. Evan further testified, "he was ready to start pointing at us, you know, nine times out of ten when somebody has a gun they don't just pull it out just to pull it out." Then Evan ran toward defendant.

Sanders testified that Evan went to the passenger side of the vehicle and at some point she saw Evan and defendant "tusslin'." Evan testified that he heard defendant screaming about the hammer; that he ran up to defendant because "he was holdin' a gun in his hand and seemed like he was going to start shooting, or pointing it toward [Sanders]"; and that he and defendant had a "little scuffle." Evan was trying to grab the gun, and he was fighting with defendant to try to

---

[2] Mariah was not identified by last name.

prevent anyone from being harmed by the gun. Sanders heard defendant scream, "let me go." Then Sanders heard a "pow," which she recognized as a gunshot. Evan heard a "ringing" and felt pain when he was shot but he did not immediately realize that he had been shot. According to Evan, he and defendant were physically fighting for one to two minutes before he was shot.

EJ testified that he was trying to go back to sleep when he heard a "big boom." He "rushed" outside. EJ testified as follows on direct examination by the prosecutor:

> *Q*. And did—what did you see then?
>
> *A*. I saw my dad laying on the floor, my mom was like "oh my gosh, Evan; oh, my gosh, Evan". Then, my mom was like, "Jennifer your boyfriend just shot my husband".
>
> *Q*. Did you see the Defendant?
>
> *A*. Yes.
>
> *Q*. Where was he?
>
> *A*. He was right behind the car on the left-hand side pointing the gun.
>
> *Q*. Did you actually see a gun?
>
> *A*. Yes.
>
> *Q*. Okay. Did you hear him, [defendant], say anything?
>
> *A*. He was just saying "back up; back up; back up; unlock the door; unlock the door", then he started screamin' "I don't want to go back to jail; I don't want to go back to jail".

EJ testified that the incident occurred at approximately 4:00 a.m. and that there was a streetlight overhead.

Sanders testified that she heard defendant say, "I don't want to go back to prison. I'm gonna go back to prison." Sanders helped Evan up because he was staggering, his ear was "hanging slightly off" his head, and he had blood on his face. Evan did not know that he had been shot until after he had been taken to the hospital, where bullet fragments were found in his face and head. Evan testified that his injuries included fractures, bruising on his brain, a severed main nerve in his face that had left that area "completely just numb," and the complete loss of sight in his right eye. Sanders suffered a cut on her arm and bruises on her knees. Sanders admitted that she was intoxicated that night, but she indicated that she was not so intoxicated that she did not remember the events and that she was "positive" about what she saw and felt that night.

Kalamazoo Public Safety Officer Matthew Gernaat testified he was dispatched to the scene based on a reported assault. When he arrived, he saw Evan lying on the floor "covered in blood" and "holding the side of his head." Gernaat saw a laceration on the side of Evan's head. At that

point, nobody indicated that Evan had been shot by a gun. After learning about the involvement of Jennifer, Jimmy, and an "unknown male named Anthony," as well as obtaining a description of the vehicle involved, Gernaat went to Jennifer's residence. Jennifer was not there, but Gernaat was "able to make contact with her through her son's cell phone." Gernaat further testified as follows:

> *Q.* And you spoke to someone you believed to be Jennifer Spicer?
>
> *A.* Yes.
>
> *Q.* Um, did you make any plan to interview her?
>
> *A.* Yes. I spoke with her briefly, as well as someone claiming to be her brother, Jimmy Spicer, um, and they were supposed to meet back at the house to speak with me regarding this incident.
>
> *Q.* Did you ever have an opportunity to interview them?
>
> *A.* No.
>
> *Q.* Did they ever contact you?
>
> *A.* No.
>
> *Q.* Was there an agreed upon meeting space and time?
>
> *A.* There was not, no, um, they—they made it sound like they were on their way back.
>
> *Q.* Did you wait?
>
> *A.* I did.

Kalamazoo Public Safety Detective Sarah Choi testified that she interviewed Evan in the hospital that morning. Evan did not know defendant's last name, but he knew his first name and was able to provide a description. Choi learned defendant's full name from Sanders at the hospital. Choi also learned that a neighbor had made a video recording of the incident.[3] Choi also interviewed EJ. According to Choi,

> "I asked [EJ] if he saw the gun, and he told me he did not because it was dark. [EJ] stated he felt like the gun must have matched the color of the car because he couldn't see it well. [EJ] told me he saw [defendant] pointing something at his

---

[3] This video was played at trial and is apparently 45 seconds long. However, the video has not been provided to this Court on appeal despite our request to the parties.

mom and dad while trying to get back in the car yelling 'unlock the door; unlock the door' ".

Choi did not interview defendant. Her entire direct testimony on this issue was as follows:

> *Q.* Did you ever have an opportunity interview him in this case?
>
> *A.* No.

On cross-examination, Choi testified as follows:

> *Q.* Did you ever, um, interview my client?
>
> *A.* I did not.

Kalamazoo Public Safety Sergeant Bryan Martin testified that he went back to the scene of the incident at some point during the day on May 4. At the scene, Martin found a hat, a "lens for prescription glasses," "women's hoop earrings," and a "pair of women's boots." He found all of these items near the curb. No shell casings were found at the scene. Martin also found a Facebook page for "Anthony Harris" that contained a video posted on May 3, taken inside a vehicle and depicting a person who looked like defendant, as well as a hat and "lenses" like the ones he found at the scene.[4] The police were unable to save this Facebook video, and it apparently was deleted from the Facebook page at some point.

Kalamazoo Public Safety Officer Jeffrey Townsend testified that he and his partner were on patrol in a marked police vehicle looking for defendant at some point when Townsend saw an individual whom he believed to be defendant based on a picture of defendant that Townsend had seen. According to Townsend, defendant was standing with a group of people and was wearing a white t-shirt and black jogging pants. Townsend and his partner drove within about 15 feet of defendant. Townsend testified that he and his partner drove past defendant, "hit a block," and then returned to the place where Townsend had seen defendant. By this time, defendant was gone. Townsend continued, "Shortly after we hit a few more blocks and, uh, I then observed him again, uh, wearing different clothing." Approximately two or three minutes had elapsed since the first time Townsend saw defendant. At this point, defendant was wearing a black and red jacket and a black and red baseball hat. Defendant was arrested at some point.[5] He did not have a gun.

The prosecutor specifically questioned Townsend as follows:

---

[4] The testimony regarding what was depicted in this video is unclear. It is not clear whether defendant was wearing these items.

[5] There is no testimony about the details of defendant's arrest, giving defendant *Miranda* warnings, or the precise order of events with respect to any interactions between the police and defendant in relation to defendant's arrest.

*Q*. Um, did you notice any injuries on the Defendant when you made contact with him?

*A*. I did, I noticed a, ah, fresh scar on the right side of his cheek.

*Q*. Did you have an opportunity to interview him?

*A*. I attempted to, yes.

*Q*. But he declined?

*A*. Correct.[6]

Dr. Gregory Wiggins, a neurosurgeon at Bronson Hospital, testified that he examined Evan in the trauma care unit on May 4, 2019. Before meeting with Evan, Wiggins reviewed a CAT scan of Evan's brain that showed "multiple bullet fragments on the right side of the face," as well as "multiple facial fractures" and a subdural hemorrhage in the right temporal lobe behind the right eye. There was also bruising to the brain. Wiggins testified that it was clearly a traumatic injury.

Jennifer, who was called as a witness by the defense, testified that Sanders was heavily intoxicated that night and was "not actin' like herself." According to Jennifer, Sanders and defendant had called each other names and when they arrived at Sanders' house to drop her off, Sanders attacked defendant when she got out of the vehicle. The fight eventually stopped, and Jennifer left with Jimmy and defendant. However, Jennifer testified that they went back to the area near Sanders' house to retrieve defendant's glasses. Jennifer gave the following description of what happened next:

> Um, instantly by the time, um, [defendant] tries to get out the car, Evan Jones instantly sprints to this man, and instantly start beatin' him up, like he was literally on top of this man, they was on the ground by that time, and they was fightin' I can't tell you how long, but—

According to Jennifer, defendant had gotten out of the vehicle to get his glasses. Jennifer testified that Sanders was running around the vehicle with a hammer. Jennifer feared for her life because Sanders was swinging the hammer and she thought Sanders was "about to knock us out with that hammer." Jennifer testified that she did not hear a gunshot and did not see anybody with a gun. However, she testified that she heard a "boom," after which defendant got back into the vehicle and they all left the area. Jennifer stated, "we hit a corner [defendant] got out, we don't know where he went, we ain't seen him the rest of the night, boop, me and my brother we head west, we instantly sleep in a parking lot." When Jennifer subsequently learned that the police were looking for her, she was surprised because she "literally didn't know this man got popped until" the next day.

---

[6] There is no testimony whether this attempt to interview defendant occurred before or after defendant was arrested or otherwise taken into custody.

Defendant also testified at trial. Defendant testified that when they arrived at Sanders' house, he and Sanders were still "bickering" and going "back and forth." Defendant further testified that as Sanders got out of the vehicle, she grabbed and scratched his face. Defendant's hat and glasses fell off. Sanders then immediately came back to the vehicle, opened defendant's door, and started "swingin'." Defendant tried to grab Sanders, apparently so she could not hit him. Defendant claimed that he did not hit Sanders. Then he let her go, pushed her back, and closed his vehicle door. After defendant and his companions drove away, defendant wanted to go back to get his glasses. He testified that when they returned approximately 5 to 10 minutes later, Jennifer got out to get his glasses and Sanders appeared, holding a hammer and shouting obscenities. Defendant stated, "I could tell she was mad, you know, 'cause it was like before we pulled off the first time she like I'm gonna go get my baby daddy, he gonna beat your ass, he gonna beat your ass, so I could tell she was hot . . . ."

Defendant then testified as follows about his altercation with Evan:

> *Q.* —what was she doing with the hammer?
>
> *A.* It looked like [Sanders] was approaching Jennifer, yellin' and cussin' and stuff. This time—at this point, she was like in the front end of the—like front end passenger front bumper part of the vehicle approachin' Jennifer, or talkin' to Jimmy, or one of the two, I don't know, I'm like, yo watch out she got a hammer, and I didn't even see the dude sneak up from behind and opened the door. Dude opened the door, and shit, as I seen him, I looked, this dude got a whole pistol in his hand, so shit, as he openin' the door, snatchin' me out, but I'm movin' fast, too, 'cause fight or flight, I'm—shit, I never been put in a situation like that before, so I stumbled out of the car. My first thing was I grabbed him. So, I'm tryin' to take control of his hand that has the pistol in it. So, we tussling, we tussling, um, at that point, ain't nobody come and try to break it up or nothin' at first, ain't nobody try to break it up. So, shit, the dude kind of got more size to me and everything, so I just tried to use all my might and I tried to swing 'em, but I'm still holdin' his wrist, I like had wrist control of him, and I have like his—his side torso, so as I move like that, he holdin' a weapon and, shit, when he swung, shit, the dude hit his own self in the—Well, I ain't gonna say I made him hit his head—hittin' his head, but shit, he had hit his face with the gun 'cause it was so close, bang, and then it went off.
>
> *Q.* So, you say that Evan had a gun?
>
> *A.* Yes, ma'am.
>
> *Q.* And you didn't have a gun?
>
> *A.* No, ma'am.
>
> *Q.* What happened from there?
>
> *A.* Well, at that point, I didn't even know the—the dude was shot, I just thought the gunshot went into the air, or somethin' like that, or I don't even know, I just hear the gunshot. So, we still wrestling; he on his feet, I'm on my feet, I leg

sweep him, swosh, dang, and at the same time the—the gun fall out his hands, or somethin' like that. The gun fall out his hand, he end up on the ground 'cause I leg sweep him, I'm tryin' to get him off of me, like a wrestling move. So, as soon as I did that it was so quick, I tried to run away, chu, chu, chu, chu, chu, I ran on the side of the car like crouched low tryin' to duck, you know, I'm thinkin' he gonna fire at me, I already heard the gun blast off one time. So, and then as I go to the passenger side, I try to—not the passenger side, I go to the driver's side tryin' to open the door, the back door, but the back door don't open. I remember (inaudible) I don't know—I don't—it was just out of adrenaline 'cause I didn't—I didn't think about it, but, um, Jennifer did say that the door was already didn't open, it didn't work. So, as I ran tryin' to keep—stay low, I never pointed at these guys, or I never—like they had testified me pointing at them or anything; I never did that. So, as I run, tryin' to stay low to—as to not get shot, 'cause I didn't know that man was hurt, or anything, I tried to run to the back driver's side of the door, or the door didn't open. The girl, [Sanders], right there with the God damn hammer tweakin' still, yellin' still, um, basically, she's still on one. So, I'm like, oh shit, I'm basically trapped in the middle, so I, ah, try to dip off around the car and hopped in the car real fast, and as I'm doin' that, shit, they already in the car at that point, shit, and ster—and then they skirted off. Shit, by the time we—I'm ducted low in the car as we pullin' off so they don't shoot at the back window or anything, so we don't shoot—'cause mind you, I did not know that that man was hurt, I did not know he was injured. So, I'm ducted—crouched low so they don't shoot at the thing. I'm like, that dude know where you live at; they know where you live at. She like, yeah, he sending me text—they was just sending me texts talkin' about they was gonna come to my house. I'm like, oh, fuck that shit, I'm not going to your house 'cause we was supposed to hook up later on that night, or whatever. I'm like, fuck that, man, he's gonna go to your house, shit, let me up out the car. So, shit, I jumped up out the car and shit, I was already on the north side when I got picked up, so I stayed on the north side.

Defendant was asked on cross-examination if he called the police after leaving the scene, and defendant indicated that he did not.

The trial court announced its decision on the record from the bench. After summarizing the trial testimony, the trial court concluded that it "accept[ed] a substantial amount of the Evan Jones, [EJ], and Precious Sanders' recall of events." The trial court explained this conclusion as follows:

> Some of the notable pieces of evidence that weigh heavily in favor of believing this version are, one, the videotape that depicts Evan Jones walking down the street, not running, with nothing in his hand, and noticeably, not reaching for anything, all the way up to the point in which he engages with the Defendant. Two, Precious Sanders' injuries that are inconsistent with the Defendant saying that he only bear hugged Sanders during incident number one. Three, the fact that the Defendant, despite his insistence that he was assaulted, not once, but twice, and once with a gun, never communicated this version to the authorities, either at his own initiative, or when he was offered an opportunity to do so. Four, the fact that

when Officer Townsend was surveilling [sic] him following the incident, the Defendant chose to put on a jacket and a hat during a period of just two to three minutes when Townsend lost sight of him, leading me, as the trier of fact, to believe that he was attempting to hide his identity. Five, that neither of the two Spicer's [sic] offered to inform law enforcement that the Defendant was the one who was assaulted, even though Officer Gernaat spoke directly with Jennifer Spicer, who communicated to her that he was at her home and ready to talk to her about the incident, and despite this invitation, neither chose to take advantage of this occasion to explain what took place at the time it occurred. And, six, that not only Evan Jones, but Precious Sanders, and [EJ], all claim that a gun was possessed by the Defendant.

While the Court does find that there are a number of inconsistencies in the Jones/Sanders' alignment of evidence, as well as some limited retelling of events, in dubious particulars such as Sanders denying being the cause of Defendant's obvious facial injuries, and Evan Jones not knowing that he had been shot, the sum total of evidence points sufficiently in favor of their version.

In Count I, the trial court found defendant guilty of committing felonious assault against Evan. The trial court explained in relevant part as follows:

The Court finds that the Defendant did have, in his possession, a gun at the time he returned to the home for incident two. Whether he had it earlier in the evening is immaterial. The Court finds, beyond a reasonable doubt, that when Evan Jones approached the passenger side of the SUV the Defendant possessed a firearm, and displayed that firearm for Evan Jones to see, and for the intended purpose of making sure Evan Jones knew that he was—knew that, and was put in fear, at least momentarily, that he may face a battery.

An assault with a dangerous weapon requires that the government prove, one, that the Defendant either attempted to commit a battery, or did an act that would cause a reasonable person to fear or apprehend an immediate battery. Two, that the Defendant intended either to injure Evan Jones, or make Evan Jones reasonably fear an immediate battery. Three, that the Defendant had the ability to commit a battery. And, four, that the Defendant committed the assault with a firearm.

Defendant's behavior meets these four elements, and such behavior amounts to an assault with a dangerous weapon. The Court accepts that a struggle took place, and that a gun was fired.

Based on all that was presented, the government has failed to establish that the Defendant intentionally discharged the weapon. The Court is unclear of the Defendant's intent at the actual time of firearm discharge. All versions presented depict a struggle between the Defendant and Evan Jones prior to the discharge. At best, there's insufficient evidence to establish that the Defendant intended to shoot

the firearm in Evan Jones' direction. And, therefore, insufficient evidence to establish that the Defendant possessed an intent to do great bodily harm.

Next, the trial court found defendant not guilty of Counts III-V, all of which were fundamentally based on defendant's alleged assaultive conduct toward Sanders.[7] The trial court found defendant guilty of felon-in-possession[8] and the two felony-firearm charges predicated on the two counts for which the trial court found defendant guilty. Defendant did not contest the third-offense habitual offender notice. The trial court sentenced defendant as previously stated. Defendant now appeals.

## II. SUFFICIENCY OF THE EVIDENCE – FELONIOUS ASSAULT

Defendant first challenges the sufficient of the evidence supporting his felonious assault conviction.

### A. ISSUE PRESERVATION AND STANDARD OF REVIEW

A criminal defendant does "not need to take any special steps" to preserve an appellate challenge to the sufficiency of the evidence supporting a conviction. *People v Hawkins*, 245 Mich App 439, 457; 628 NW2d 105 (2001).

"In a bench trial, . . . the trial court is obligated to find the facts specially, state separately its conclusions of law, and direct entry of the appropriate judgment. The court must state its findings and conclusions on the record or in a written opinion made a part of the record." *People v Xun Wang*, 505 Mich 239, 250; 952 NW2d 334 (2020) (quotation marks and citations omitted). "Challenges to the sufficiency of the evidence are reviewed de novo." *Id.* at 251. "The evidence in a bench trial is sufficient if, when viewed in the light most favorable to the prosecutor, a rational factfinder could determine that each element of the crime had been proved beyond a reasonable doubt." *Hawkins*, 245 Mich App at 457. "[W]hen an appellate court reviews the evidence supporting a conviction, factual conflicts are to be viewed in a light favorable to the prosecution . . . ." *People v Wolfe*, 440 Mich 508, 515; 489 NW2d 748 (1992), amended 441 Mich 1201 (1992).

### B. ANALYSIS

Pursuant to MCL 750.82(1), "a person who assaults another person with a gun, revolver, pistol, knife, iron bar, club, brass knuckles, or other dangerous weapon without intending to commit murder or to inflict great bodily harm less than murder is guilty of a felony punishable by imprisonment for not more than 4 years or a fine of not more than $2,000.00, or both." Accordingly, " '[t]he elements of felonious assault are (1) an assault, (2) with a dangerous weapon, and (3) with the intent to injure *or place the victim in reasonable apprehension of an immediate*

---

[7] As previously noted, defendant was charged in these counts with felonious assault, simple assault, and felony-firearm.

[8] The parties stipulated to the introduction of a certified record of defendant's criminal history.

-10-

*battery.' " People v Chambers*, 277 Mich App 1, 8; 742 NW2d 610 (2007), quoting *People v Avant*, 235 Mich App. 499, 505; 597 NW2d 864 (1999) (emphasis added).

In this case, defendant only challenges the sufficiency of the evidence with respect to the intent element. While the trial court found that there was not sufficient evidence to establish that defendant intended to discharge the firearm or intended to shoot the gun toward Evan, the trial court also found that it was unclear what defendant's intent was at the time the weapon was discharged. Based on those findings, the trial court concluded that there was insufficient evidence to establish that defendant had an intent to do great bodily harm.

However, the trial court's finding with respect to the lack of sufficient evidence of an intent to do great bodily harm is not inconsistent with finding defendant guilty of felonious assault because MCL 750.82(1) specifically provides that a person is guilty of this crime if the person "assaults another person with a gun, revolver, pistol, … or other dangerous weapon *without intending to commit murder or to inflict great bodily harm less than murder*." (Emphasis added.) The trial court found beyond a reasonable doubt that defendant "displayed that firearm for Evan Jones to see" as Evan was approaching the vehicle and that defendant displayed the firearm "for the intended purpose of making sure Evan Jones knew that he was—knew that, and was put in fear, at least momentarily, that he may face a battery." Accordingly, the trial court made a finding that sufficient intent existed to satisfy this element of the offense. *Avant*, 235 Mich App at 505 (stating that a conviction of felonious assault requires sufficient evidence that the defendant acted "with the intent to injure or place the victim in reasonable apprehension of an immediate battery"). Thus, contrary to defendant's argument on appeal, the trial court made a finding that defendant possessed the requisite intent to be found guilty of the crime of felonious assault, and this finding was grounded on a proper view of the elements of this offense. MCL 750.82(1); *Avant*, 235 Mich App at 505; *Chambers*, 277 Mich App at 8.

Moreover, the trial court's finding regarding intent was supported by the trial evidence. Evan testified that he saw defendant with the gun in his hand when defendant got out of the vehicle and that he was afraid that defendant would start shooting because "nine times out of ten when somebody has a gun they don't just pull it out just to pull it out." Viewing this evidence in the light most favorable to the prosecution, *Hawkins*, 245 Mich App at 457, a rational trier of fact could conclude beyond a reasonable doubt that Evan feared that he would suffer an imminent battery by being shot when he saw defendant brandishing the gun. See *People v Morris*, 314 Mich App 399, 410; 886 NW2d 910 (2016) ("A battery is the wilful and harmful or offensive touching of another person which results from an act intended to cause such a contact.") (quotation marks and citation omitted); *Avant*, 235 Mich App at 505-506 (holding that testimony that the defendant "pointed an assault weapon" at the victim's face while the victim was robbed was "sufficient for a reasonable factfinder to find that the elements of felonious assault . . . were established beyond a reasonable doubt").

A rational trier of fact could also infer from defendant's display of the firearm that he intended to cause the fear of an immediate battery. See *Hawkins*, 245 Mich App at 458 ("A factfinder can infer a defendant's intent from his words or from the act, means, or the manner employed to commit the offense. In other words, a defendant's intent can be proved by circumstantial evidence.") (citations omitted); cf also *People v Robinson*, 145 Mich App 562, 566;

-11-

378 NW2d 551 (1985)[9] ("It would be almost absurd for a fact finder to find that the defendant had raised his knife hand as if to strike the child, without also implicitly finding that defendant at least intended to place the child in reasonable fear of a battery.").

The evidence discussed above also supported the finding that there was an assault, see *Avant*, 235 Mich App at 506 n 2 ("A simple criminal assault is either an attempt to commit a battery or an unlawful act that places another in reasonable apprehension of receiving an immediate battery."), and the trial court's finding that defendant possessed the firearm. Therefore, a rational trier of fact also could have found that the remaining elements of felonious assault were proven beyond a reasonable doubt. *Chambers*, 277 Mich App at 8.

To summarize, viewing the evidence in the light most favorable to the prosecution, a reasonable trier of fact could have found (as the trial court did) from the trial evidence that defendant brandished a firearm and placed Evan in apprehension of an immediate battery, which satisfies the elements of felonious assault. *Id*.; see also *Avant*, 235 Mich App at 505-506 (holding that testimony that the defendant pointed an assault weapon at the victim's face while the defendant's associates robbed the victim, along with evidence that the victim was afraid, was "sufficient for a reasonable factfinder to find that the elements of felonious assault … were established beyond a reasonable doubt"). Defendant has not demonstrated on appeal that the evidence was insufficient to support his conviction for felonious assault.

## III.  POST-*MIRANDA* SILENCE

Next, defendant argues that his Fifth Amendment rights were violated by the trial court's use of his post-*Miranda* [10]silence against him to disbelieve defendant's testimony and to support its finding of guilt.

### A.  ISSUE PRESERVATION AND STANDARD OF REVIEW

Generally, "[f]or an issue to be preserved for appellate review, it must be raised, addressed, and decided by the lower court." *People v Metamora Water Serv, Inc*, 276 Mich App 376, 382; 741 NW2d 61 (2007). Here, defendant concedes that he did not object on this basis in the trial court. Therefore, this issue is unpreserved. *Id*.

An unpreserved claim that a defendant's post-*Miranda* silence was used against him or her in violation of the defendant's constitutional rights presents a "claim of constitutional error." *People v Shafier*, 483 Mich 205, 211; 768 NW2d 305 (2009). Constitutional issues are reviewed de novo, and the effect of an unpreserved constitutional error is reviewed for plain error. *Id*. Our Supreme Court has set forth the plain-error test as follows:

---

[9] "Published cases issued before November 1, 1990, are not precedentially binding on this Court, although they may be persuasive authority." *People v Barbarich*, 291 Mich App 468, 476 n 2; 807 NW2d 56 (2011), citing MCR 7.215(J)(1).

[10] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings. "It is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." Finally, once a defendant satisfies these three requirements, an appellate court must exercise its discretion in deciding whether to reverse. Reversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error " 'seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings' independent of the defendant's innocence." [*People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999) (citations omitted; alteration in original).]

B.  ANALYSIS

Our Supreme Court has explained the relevant standards with respect to a defendant's post-*Miranda* silence as follows:[11]

The United States Constitution guarantees that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. Am. V.  *Miranda v Arizona*, 384 US 436, 444-439, 467-468; 86 S Ct 1602; 16 L Ed 2d 694 (1966), established "guidelines for law enforcement agencies and courts to follow" in order to protect the privilege against compelled self-incrimination during custodial police interrogations. Thus, under *Miranda*, every person subject to interrogation while in police custody must be warned, among other things, that the person may choose to remain silent in response to police questioning. *Id*. at 444-445. As a general rule, if a person remains silent after being arrested and given *Miranda* warnings, that silence may not be used as evidence against that person. *Wainwright v Greenfield*, 474 US 284, 290-291; 106 S Ct 634; 88 L Ed 2d 623 (1986). Therefore, in general, prosecutorial references to a defendant's post-arrest, post-*Miranda* silence violate a defendant's due process rights under the Fourteenth Amendment of the United States Constitution. See *Wainwright*, 474 US at 290-291; [*Doyle v Ohio*, 426 US 610, 618–620; 96 S Ct 2240; 49 L Ed 2d 91 (1976)].

The United States Supreme Court has explained the rationales behind the constitutional prohibition against the use of a defendant's post-arrest, post-*Miranda* silence. To begin with, a defendant's silence may merely be the defendant's

---

[11] Defendant only relies on the federal constitution for his claim that the trial court improperly used his post-*Miranda* silence against him. Our Supreme Court has "recognized that the Michigan Constitution's protection against the use of a defendant's post-arrest, post-*Miranda* silence is at least as extensive as that provided by the United States Constitution." *Shafier*, 483 Mich at 212 n 6. "The Fifth Amendment has been made applicable to the states through the Due Process Clause of the Fourteenth Amendment." *Id*. at 212 n 7, citing *Malloy v Hogan*, 378 US 1, 3; 84 S Ct 1489; 12 L Ed 2d 653 (1964).

invocation of the right to remain silent, as opposed to a tacit acknowledgement of guilt. "[E]very post-arrest silence is insolubly ambiguous . . . ." *Doyle*, 426 US at 617. Further, *Miranda* warnings provide an implicit promise that a defendant will not be punished for remaining silent. Once the government has assured a person of his right to remain silent, "breaching the implied assurance of the *Miranda* warnings is an affront to the fundamental fairness that the Due Process Clause requires." *Wainwright*, 474 US at 291.

Consistent with these rationales, a defendant's post-arrest, post-*Miranda* silence cannot be used to impeach a defendant's exculpatory testimony, see *Doyle*, or as direct evidence of defendant's guilt in the prosecutor's case-in-chief, see *Wainwright*, 474 US at 292-294. "What is impermissible is the evidentiary use of an individual's exercise of his constitutional rights after the State's assurance that the invocation of those rights will not be penalized." *Id*. at 295. There are limited exceptions to this general rule, but none applies here. This Court has adopted this understanding of a defendant's due process rights and stated that post-arrest, post-*Miranda* silence "may not be used substantively or for impeachment purposes since there is no way to know after the fact whether it was due to the exercise of constitutional rights or to guilty knowledge." *People v McReavy*, 436 Mich 197, 218; 462 NW2d 1 (1990).

In general, any reference to a defendant's post-arrest, post-*Miranda* silence is prohibited, but in some circumstances a single reference to a defendant's silence may not amount to a violation of *Doyle* if the reference is so minimal that "silence was not submitted to the jury as evidence from which it was allowed to draw any permissible inference . . . ." *Greer v Miller*, 483 US 756, 764-765; 107 S Ct 3102, 97 L Ed 2d 618 (1987). . . . For example, in *Greer*, there was no *Doyle* violation where the defense counsel immediately objected to a question by the prosecution about defendant's post-arrest, post-*Miranda* silence, and the trial court twice gave a curative instruction to the jury. *Greer*, 483 US at 759, 764-765. [*Shafier*, 483 Mich at 212-215 (first and second ellipses and second alteration in original).]

In this case, defendant argues that the trial court violated his constitutional rights by considering his post-*Miranda* silence because the trial court found that it would substantially accept the testimony of Sanders, Evan, and EJ over that of defendant based, in part, on "the fact that the Defendant, despite his insistence that he was assaulted, not once, but twice, and once with a gun, never communicated this version to the authorities, either at his own initiative, or when he was offered an opportunity to do so."

This statement, when considered in isolation and along with the reasonable presumption that defendant was given *Miranda* warnings when he was arrested, at first appears so broad as to include defendant's post-*Miranda* silence. As our Supreme Court has stated, "a defendant's post-arrest, post-*Miranda* silence cannot be used to impeach a defendant's exculpatory testimony, see *Doyle*, or as direct evidence of defendant's guilt in the prosecutor's case-in-chief, see *Wainwright*, 474 US at 292-294." *Shafier*, 483 Mich at 213-214. This Court has held that it was reversable— not harmless—error for a trial judge in a bench trial to use a defendant's post-*Miranda* silence against him in violation of the Fifth Amendment to resolve factual and credibility disputes and

-14-

find defendant guilty. *People v Smith*, 190 Mich App 352, 353, 356; 475 NW2d 875, 876 (1991), judgment vacated in part on other grounds, lev den in part by 439 Mich 954 (1992).[12]

However, in this case, there was no evidence regarding defendant being given *Miranda* warnings or of any events that may be said with any reasonable degree of certainty to have occurred *after* defendant received his *Miranda* warnings. Although Townsend testified that he attempted to interview defendant and defendant declined to speak, there is no evidence from which the trial court or this Court could conclude that this interaction occurred after giving defendant *Miranda* warnings as opposed to when Townsend first interacted with defendant and before defendant was taken into custody.

There can be no dispute that the trial court was required to base its factual findings on the evidence actually introduced at trial. See, e.g., *Jackson v Virginia*, 443 US 307, 316; 99 S Ct 2781; 61 L Ed 2d 560 (1979) (explaining as "an essential of the due process guaranteed by the Fourteenth Amendment that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as *evidence* necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense.") (emphasis added). In this case, there was no evidence introduced at trial of any circumstances that occurred at the time, or after, defendant received *Miranda* warnings. There was no evidence at trial that defendant was given *Miranda* warnings, although it may reasonably be assumed that defendant received *Miranda* warnings upon his arrest and defendant does not claim otherwise. Defendant concedes on appeal that there was no evidence of his *Miranda* warnings introduced at trial. There was also no evidence specifically describing his arrest. Viewing the record evidence as a whole, it is clear that the trial focused on the events preceding and up to defendant's arrest as, defendant's actual arrest, the giving of *Miranda* warnings, and defendant's statements or silence following *Miranda* warnings were not introduced at trial.

This conclusion is further bolstered by the prosecutor's closing argument. The prosecution did not argue that defendant's post-*Miranda* silence demonstrated his guilt or impeached his trial

---

[12] Notably, this Court also stated in *Smith*, 190 Mich App at 354-355:

First and foremost, the dissent reasons that this is not a "typical" case of a defendant's silence being used against him because it does not involve an attempt by a *prosecutor* to elicit testimony concerning the defendant's post-*Miranda* silence. We are willing to assume for the sake of argument that this case is "atypical" for the reason that here the trial judge, not the prosecutor, initiated the Fifth Amendment violation. We disagree with our colleague that this distinction makes the constitutional violation less offensive. On the contrary, the Fifth Amendment violation at issue appears to be more egregious than that in the "typical" case. In this case, the trial judge, sitting as the trier of fact, found the defendant to be guilty in part because the defendant chose to exercise his Fifth Amendment rights. It is hard to imagine a more clear and direct Fifth Amendment violation.

testimony. Instead, the prosecutor focused on what occurred before defendant was arrested, arguing during closing argument as follows:

> Officer Townsend finds him. He sees him, they drive by in a marked police car, they hit a block, they turn around, by the time they come back Defendant's gone. And when they find him a couple minutes later, he's changed clothes. Defendant didn't flag 'em down; hey, somebody just pulled a gun on me. Nope, he decides he's out of there.

The prosecutor also argued in rebuttal:

> When the—the police saw [defendant], he didn't stop, he didn't you know, his adrenaline stopped and he took his nap, but then when he had a chance to see the police then he didn't, he turns, leaves, puts on different clothes.

Accordingly, to the extent the trial court considered defendant's failure to inform the police of his version of events wherein he was allegedly the actual victim, the only evidence in the record supporting such a finding involved pre-*Miranda* silence.[13] This included evidence that defendant left the area after the incident and did not contact the police, as well as evidence that defendant apparently tried to hide from the police by changing his clothes when Townsend's marked police vehicle drove within 15 feet of defendant. "The United States Constitution does not prohibit impeaching a defendant with pre-arrest silence." *Shafier*, 483 Mich at 213 n 8. Without pointing to any evidence of any events that occurred after defendant was given *Miranda* warnings that was actually introduced at trial and thereby placed before the trial court at the time that it made its findings, defendant has failed on appeal to show that the trial court committed any error regarding the use of post-*Miranda* silence. *Id.* at 213-214, 213 n 8. Because defendant has not demonstrated any error, he has failed to meet his burden of demonstrating plain error affecting his substantial rights. *Carines*, 460 Mich at 763-764.

Defendant argues in the alternative that his trial counsel was ineffective for failing to object on the ground that the trial court used his post-*Miranda* silence against him. "[E]stablishing ineffective assistance requires a defendant to show (1) that trial counsel's performance was objectively deficient, and (2) that the deficiencies prejudiced the defendant." *People v Randolph*, 502 Mich 1, 9; 917 NW2d 249 (2018). Here, because the trial court did not consider any post-*Miranda* silence by defendant and therefore did not err on that basis, any objection by defendant's trial counsel on this ground would have been futile. "Counsel is not ineffective for failing to make a futile objection." *Chambers*, 277 Mich App at 11. Therefore, defendant also has not established that he was denied the effective assistance of counsel.

IV. SENTENCING

---

[13] Thus, any claim that defendant *also* exercised his right to remain silence after receiving *Miranda* warnings is irrelevant because that post-*Miranda* silence was not introduced as evidence at trial and therefore did not influence the trial court's findings.

Finally, defendant challenges the scoring of OV 3 and OV 4. Defendant argues that offense variable (OV) 3 was erroneously scored at 25 points because there was no evidence of a life threatening or permanent incapacitating injury to a victim. Defendant contends that 10 points should have been assessed instead under OV 3 because there was only evidence of an injury requiring medical treatment. Defendant also argues that OV 4 was erroneously scored at 10 points because there was no evidence that a victim suffered psychological injury.

## A. ISSUE PRESERVATION AND STANDARD OF REVIEW

Defendant preserved these scoring challenges for appeal through his motion to remand filed in this Court. See MCL 769.34(10) ("A party shall not raise on appeal an issue challenging the scoring of the sentencing guidelines or challenging the accuracy of information relied upon in determining a sentence that is within the appropriate guidelines sentence range unless the party has raised the issue at sentencing, in a proper motion for resentencing, or in a proper motion to remand filed in the court of appeals."); *People v McChester*, 310 Mich App 354, 357; 873 NW2d 646 (2015) (holding that the defendant "adequately preserved" a challenge to the scoring of OV 4 through a motion to remand filed in the Court of Appeals even though defense counsel had indicated during the sentencing hearing that there were no corrections necessary to the guidelines scoring).[14]

> Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence. Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo. [*People v Hershey*, 303 Mich App 330, 335-336; 844 NW2d 127 (2013) (quotation marks and citation omitted).

## B. ANALYSIS

With respect to OV 3, MCL 777.33 provides in relevant part as follows:

> (1) Offense variable 3 is physical injury to a victim. Score offense variable 3 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:
>
> * * *
>
> (c) Life threatening or permanent incapacitating injury occurred to a victim ……………………………………………………………… 25 points

---

[14] Accordingly, we also reject the prosecution's argument that defendant waived these challenges through defense counsel's indication at sentencing that there were no objections to the guidelines scoring. See *McChester*, 310 Mich App at 357; *People v Hershey*, 303 Mich App 330, 354; 844 NW2d 127 (2013).

(d) Bodily injury requiring medical treatment occurred to a victim …………………………………………………………………………..10 points

In arguing that he was improperly assessed 25 points for OV 3, defendant fails to acknowledge Evan's testimony that as a result of this incident, he lost sight in his right eye and was continuing to experience complete numbness in the right side of his face due to a severed nerve. This evidence was sufficient to justify a 25-point score for OV 3 as a permanent incapacitating injury. See *People v Massey*, unpublished per curiam opinion of the Court of Appeals, issued March 21, 2019 (Docket No. 338183), p 2, lv den and matter remanded on other grounds by 505 Mich 940 (2019) (holding that the trial court did not clearly err by finding that 25 points was appropriate for OV 3 where the victim had been stabbed in multiple parts of the body and at the time of trial still had an unrepairable hole in his lung and significant nerve damage to his dominant hand).[15]

With respect to OV 4, MCL 777.34 provides in relevant part as follows:

(1) Offense variable 4 is psychological injury to a victim. Score offense variable 4 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:

(a) Serious psychological injury requiring professional treatment occurred to a victim …………………………………………………………………10 points

* * *

(c) No serious psychological injury requiring professional treatment occurred to a victim ……………………………………………………………. 0 points

(2) Score 10 points if the serious psychological injury may require professional treatment. In making this determination, the fact that treatment has not been sought is not conclusive.

"[S]peculation cannot form the basis to affirm a 10–point score for OV 4." *McChester*, 310 Mich App at 359. On appeal in this case, the prosecution does not point to any record evidence to support the 10-point score for OV 4 and instead concedes that there is insufficient record evidence to support this score. Notably, the presentence investigation report does not contain a victim impact statement, and Evan did not provide any specific testimony at trial regarding his psychological state. Accordingly, defendant should have been assessed 0 points for OV 4. *Id.*; *Hershey*, 303 Mich App at 335-336.

At sentencing, defendant's minimum guidelines range was determined to be 19 to 57 months, based in part on a total OV score of 70, which placed him at OV Level V on the Class E sentencing grid. MCL 777.66. Correcting defendant's score for OV 4 results in a total OV score

---

[15] Unpublished opinions of this Court are not binding but may be considered persuasive. *People v Green*, 260 Mich App 710, 720 n 5; 680 NW2d 477 (2004).

of 60, which is still within the range of 50 to 74 for OV Level V on the Class E sentencing grid. MCL 777.66. Therefore, this error did not affect defendant's guidelines range. *Id*. Because defendant's guidelines range was not affected, resentencing is not required. *People v Bailey*, 330 Mich App 41, 63; 944 NW2d 370 (2019). However, we remand this matter to the trial court for the ministerial task of correcting defendant's OV score. *Id*. at 63 n 2.

Affirmed with respect to defendant's convictions and sentences but remanded solely for the ministerial task of correcting defendant's OV 4 score. We do not retain jurisdiction.

/s/ James Robert Redford
/s/ Stephen L. Borrello
/s/ Jonathan Tukel